Dear Mr. Anthony Myers, Acting Chairman
You requested our opinion concerning the types of expenditures that the Emergency Number Systems Board ("ENSB") may authorize from the 911 Trust Fund ("the Fund"). In particular, you asked whether a wireless telephone company is entitled to recover from the Fund its costs of providing enhanced 911 service for its customers.
In our opinion, a wireless telephone company does not have a right to recover from the Fund its expenses of providing enhanced 911 service. However, the ENSB has discretion to approve payments from the Fund for those costs, if the company incurs the costs pursuant to a contract with a local government, if the request is consistent with local plans for enhanced 911 services, and if the expenses otherwise qualify for reimbursement under the State 911 Law.[1]
 I 911 Services
Although emergency services and the telephone number "911" have long been synonymous, the technology involved in the operation of 911 systems has changed significantly since 911 first became the universal emergency telephone number. For many years, when a person dialed 911, the call was directed through a central office of the local telephone company to a "public safety answering point" or "PSAP." A dispatcher at the PSAP answered the call, determined the location and needs of the caller, and notified the appropriate agency of the required emergency services. However, the areas covered by a telephone company's central offices and the boundaries of political jurisdictions operating PSAPs rarely coincided. Moreover, the dispatcher would not know the caller's location without a verbal inquiry.
Advances in technology led to the development of "enhanced 911" systems. An "enhanced 911" system automatically connects a caller to the appropriate PSAP and displays for the dispatcher on a computer monitor the caller's number, the name and address of the subscriber of that number, and possibly additional information.[2] If the caller is disconnected or if a caller is unable to speak, assistance can still be dispatched to the appropriate location. An "enhanced 911" system accomplishes this through such features as automatic number identification ("ANI"), automatic location information ("ALI"), and selective routers.
ANI automatically informs the dispatcher at the PSAP of the caller's number. An ALI database automatically relates that telephone number to the subscriber's name and address. When the address of the telephone can be automatically determined, a selective router, which connects multiple central offices, can relay the call to the appropriate PSAP based on the caller's location.
Some advances in telephone technology have challenged the ability of 911 systems to provide enhanced 911 service. When 911 service began, virtually all telephone service was provided by local "wireline" telephone companies. The explosive increase in the number of wireless telephones has compromised the ability of 911 systems to provide automatic location information. The provision of enhanced 911 services for wireless callers is complex and involves technology in addition to that needed for wireline services.
When a 911 call is made from a wireless telephone, it passes through the wireless carrier's mobile switching center before it enters the existing wireline network and is directed to the 911 selective router of the local wireline telephone company. To provide enhanced 911 service, a wireless carrier must convert a 911 call into a format that the wireline carrier can process and transmit to the appropriate PSAP.
Without additional technology, the system is unable to transmit automatically and precisely the wireless caller's location.
 II Maryland's 911 Law
A. Mandate for Enhanced 911
In 1979, the General Assembly established 911 as "the primary emergency telephone number" in the State and enacted legislation "to provide for the orderly installation of 911 systems." Chapter 730, Laws of Maryland 1979, now codified at Annotated Code of Maryland, Article 41, § 18-101
et seq. ("911 Law").[3] The 911 Law now requires each county[4] in Maryland to have in place an enhanced 911 system. § 18-102(a). The ENSB[5] is responsible for "coordinat[ing] the enhancement of county 911 systems." Counties were required to submit plans to the ENSB for enhanced 911 systems in accordance with ENSB guidelines. §§ 18-103(h)(1) and 18-104. An "enhanced 911" system must include ANI, ALI, and any "future technological advancements that the [ENSB] may require." § 18-101(f)(6).
B. The 911 Trust Fund
As part of the 911 Law, the Legislature established the Fund to assist counties with the costs of 911 systems and enhancements. The Fund consists in part of a monthly 10¢ fee imposed on subscribers to "switched local exchange access service, wireless telephone service, or other 911-accessible service." § 18-105(b). State law also permits each county to impose an additional charge of up to 50¢ per month for subscribers within the county. § 18-105(c). Both the Statewide fee and local charges are collected by telephone companies as part of a subscriber's telephone bills and forwarded to the Fund.[6]
§ 18-105(b)-(c).
Subject to the State budget, the proceeds of the Statewide fee are available to the ENSB to reimburse the counties for the costs of 911 system enhancements. §§ 18-105(a), (f), and 18-107. A county may use distributions of the additional local fee to offset operational costs of its 911 system, including "telephone company charges, equipment costs or equipment lease charges, repairs, utilities, personnel costs, and appropriate carryover costs from previous years." §§ 18-107(f)(2) and 18-108(b).
Direct payments may be made from the Fund to a private contractor for system enhancements provided to a county, as long as the enhancements are required by the ENSB and the ENSB has given advance approval of the cost. §§ 18-103(h)(11) and 18-107(f)(1)(ii). Each county's expenditures from the Fund are subject to audit by the ENSB. § 18-108(a).
C. Wireline Telephone Companies under the Maryland 911 Law
When 911 systems were first implemented, an individual could reach a PSAP by dialing 911 because that number is translated into a seven- or ten-digit number of a PSAP at a central office of the wireline telephone company. Unsurprisingly, the 911 Law has always defined a "911 system" to include equipment outside the PSAP that belongs to the wireline telephone company: "equipment for connecting and outswitching 911 calls within a telephone central office, [and] trunking facilities from the central office to a public safety answering point. . . ." See § 18-101(f)(5).
A wireline telephone company is not obligated to provide this equipment without charge. In particular, the 911 Law provides that "[n]othing in this subtitle requires a [wireline telephone company] to provide any equipment or service other than pursuant to tariffs. . . ." § 18-106(a). In addition to paying for on-site equipment at a PSAP, the counties may use distributions from the Fund to pay for equipment for "connecting and outswitching 911 calls within a telephone central office, trunking facilities from the central office to a public safety answering point, and equipment to connect 911 calls to the appropriate public safety agency." § 18-101(f)(5).[7] And, when providing system enhancements, a telephone company may qualify for direct payment from the Fund, with the approval of the ENSB, as a contractor with a county. See § 18-103(h)(11).
D. Wireless Carriers under the 911 Law
The General Assembly acknowledged the increased number of 911 calls originating from wireless telephones when it extended the Statewide fee and additional local charges to wireless telephones in 1995 and when it expanded the ENSB in 1996 to include a representative of the wireless industry. §§ 18-105(b)(1) and (c)(1); 18-103(b)(2). However, the 911 Law does not specifically address the extent to which equipment of a wireless carrier[8] is part of the "911 system" subsidized by the Fund. Nor does the law mandate that a wireless carrier provide any equipment or service. In particular, a "parity provision" applicable to wireless companies provides as follows:
 Nothing in this subtitle requires a [wireless telephone company] to provide any equipment or service other than the equivalent of that required of telephone companies under [§ 18-106(a)].
§ 18-106(b). As noted above, § 18-106(a) provides that wireline telephone companies are not obligated to provide equipment or services for the 911 system except in accordance with approved tariffs.
You indicated that representatives of the wireless industry have argued that the parity provision of the State 911 Law entitles wireless carriers to recover from the Fund their costs for enhanced 911 services.[9] The effect of the parity provision of the 911 Law must be assessed in light of a wireless carrier's obligation to provide enhanced 911 service under federal law.
 III Obligation of Wireless Carriers under Federal Law
A. FCC Orders
Since 1996, the Federal Communications Commission ("FCC") has required wireless carriers to provide their customers with access to 911 emergency services through a series of orders issued under the Communications Act of 1934, 47 U.S.C. § 151 et seq.
In a Report and Order effective October 1, 1996,[10] the FCC required that wireless carriers provide basic 911 services within one year, so that a caller could reach a PSAP by dialing 911, a service level sometimes referred to as "Phase zero." The FCC further required wireless carriers to provide enhanced 911 services in two phases. In Phase I, a wireless carrier was to transmit a 911 caller's phone number, as well the location of the base station or cell site receiving the call, to the PSAP. In Phase II, the wireless carrier was to identify the location of the caller within prescribed specifications. Phase I services were to be provided by April 1998; the deadline for Phase II was October 2001. A wireless carrier was required to offer these services only if (1) the designated PSAP capable of using the required data requested the services and (2) a mechanism for recovering the cost of the services was in place. See 61 Fed. Reg. 40348 (August 2, 1996) adopting47 C.F.R. § 20.18.
In subsequent years, the FCC has modified the implementation requirements and has addressed alternative technologies.[11]
Significant for our purposes is the FCC's decision in 1999 to eliminate the requirement that a cost recovery system for carriers be in place as a condition of Phase I and Phase II implementation. Second Memorandum Opinion and Order, summarized at 64 Fed. Reg. 72951 (December 29, 1999).[12]
The FCC explained:
 Although a number of States have decided that separate E911 cost recovery mechanisms are the best way to recover carriers' costs . . . such mechanisms are not necessary to permit [wireless] carriers, whose rates are not regulated, to recover their costs. As a result, the Commission sees no need to make the obligations of carriers to implement E911 service contingent on the resolution of carrier cost recovery issues.
Id. at 72952. However, in deciding to eliminate the cost recovery condition for wireless providers, the FCC made clear that its intent was not to "discourage [States or localities] from deciding that cost recovery or sharing mechanisms that cover carrier costs are an effective way of expediting wireless E911 . . ." Id.[13]
B. FCC Staff Interpretation
More recently, the FCC staff addressed cost allocation responsibilities in connection with Phase I of wireless enhanced 911 services. Letter from Thomas J. Sugrue, Chief, Wireless Telecommunications Bureau, to Marlys R. Davis, King County E-911 Program Manager (May 7, 2001).[14] Although the staff emphasized that the FCC favors negotiation between the parties as the most efficacious and efficient means of resolving cost allocation disputes, it concluded that the proper demarcation point for the allocation of costs between wireless carriers and PSAPs is the point of input at the 911 selective router maintained by the wireline telephone company.[15] Under that interpretation, wireless carriers are responsible for the expenses associated with providing data in a form compatible with the existing 911 network.[16]
 IV Wireless Carriers and the Fund
A. Role of the Fund in the 911 Law
On its face, the 911 Law creates no entitlement for a wireless carrier — or even a wireline carrier — to recover from the Fund its costs of enhanced 911 service. The statute states that the purpose of the Fund is to "reimburs[e] the counties for enhancements to a 911 system" and "[pay county] contractors [for qualifying enhancements]." § 18-105(a). While it may be inevitable that a county will contract with a local wireline telephone company to carry out its obligations under the 911 Law, the statute itself does not confer on the telephone service provider a right to reimbursement independent of that contract. Similarly, the statute establishing the Fund does not create any entitlement for reimbursement of a wireless carrier's costs associated with 911 services, independent of a contractual relationship with a county.
B. Legislative History of the Fund
A review of the history of legislation establishing the Fund confirms that the General Assembly did not intend that wireless carriers recover from the Fund their costs of providing enhanced 911 services, absent a contractual relationship with a county for those services.
1. Initial Legislation ) 1979
When the General Assembly first mandated in 1979 that each county establish a 911 system, it also established the Fund to help defray the costs that counties would incur to establish 911 systems and to enhance those already in place. Chapter 730, Laws of Maryland 1979, then codified at Annotated Code of Maryland, Article 41, § 204H-1 et seq.[17] The Fund was available to award grants to the counties for the installation of equipment and, during the initial twelve months of operation, for service and certain operating costs. See § 204H-7 (1979 Supp.). To qualify for State funding, a county was required to submit to the ENSB a 911 system plan in accordance with guidelines developed by the ENSB. § 204H-4. State funding was not to be used for personnel required to operate the system or for building construction or renovations. § 204H-7(a)(2) and (3). Funding was based on county population levels and the maximum amount available to any county was $800,000. § 204H-7(a)(4)-(6) and (c). A county that already had a 911 system in place could apply for reimbursement of certain costs. § 204H-7(b). Funding was provided through a Statewide surcharge imposed on subscribers' telephone accounts. § 204H-5(b).
2. Addition of County Fee and Restructuring of the Fund ) 1983
In 1983, the General Assembly extended the Statewide surcharge and authorized each county to impose an additional charge. Chapters 67 and 68, Laws of Maryland 1983. The intent was "to offset continuing operational and maintenance costs for local subdivisions in providing the mandated 911 service." Maryland Association of Counties' position paper on Senate Bill 542 (1983). The Fund was restructured so that both the Statewide fee and local charges were allocated to individual county accounts. Article 41, § 204H-5(b) (1983 Supp.). While the legislation allowed a telephone company to retain a percentage of the Statewide fee to "cover the expenses of billing, collecting, and remitting" the Statewide fee and local charges, id., the focus of the 911 Trust Fund remained on assisting the counties implement system enhancements and helping offset operational costs in connection with local 911 systems. As explained in a 1989 study produced for the General Assembly:
 Funding for local 911 systems has always been subject to certain statutory restrictions. Funds from the [surcharge in place between 1979 and 1983] can only be used to reimburse the jurisdictions for the purchase and installation of equipment, and operating costs incurred during the first 12 months of operation. . . . [Under the 1983] revision, local governments were free to use monies gained from the State 10 cent fee to finance any facet of their 911 systems . . . Use of the local fee, however, was restricted according to the jurisdiction's population. . . . The purpose of these funding restrictions was to encourage the jurisdictions to develop the technical sophistication of their 911 systems . . .
Department of Fiscal Services, The 911 Emergency Number System: A Maryland Perspective p. 6 (November 1989).
3. Enhanced 911 ) 1990
In 1990, the General Assembly mandated that local jurisdictions have enhanced 911 systems in place by July 1, 1995. Chapter 510, Laws of Maryland 1990; see Article 41, § 18-102(a) (1990 Repl. Vol.).[18]
Because every county then had at least a basic 911 system in place, statutory provisions governing county plans were amended to focus on enhancements, and the State-wide fee was redirected to reimburse counties for enhancement costs. §§ 18-104 and 18-107(f)(1). The 1990 legislation increased the maximum amount of the additional county charge and granted counties additional flexibility to cover operational costs. §§ 18-105(c), 18-107(f)(2), and 18-108(d) and (e). In terms of the Statewide fee, the fiscal note explained, "[t]hese funds may only be used to reimburse counties for enhancements to 911 systems which are approved by the [ENSB] . . ." Revised Fiscal Note on Senate Bill 822 (1990). Thus, the Fund was to support the county provision of 911 services.
4. Direct Payments from the Fund to Private Vendors ) 1992
In 1992, the General Assembly first authorized the ENSB to approve direct payments from the Fund to parties other than county governments. Chapter 500, Laws of Maryland 1992. This legislation did not alter the permissible uses of the 911 Trust Fund. Rather, the purpose of the 1992 amendment was to grant "the ENSB the discretion of providing these funds directly to the contractor in instances where the enhancement is required by the [ENSB] and the county has not had the opportunity to budget for these funds." Testimony of the ENSB Coordinator on Senate Bill 670 (February 26, 1992). Direct payments were allowed for enhancements required by the ENSB and approved by the ENSB before a county and vendor had entered into a contract. § 18-103(h)(11). Presumably, a telephone company providing equipment or services could be a vendor.
5. Extension of Fees to Wireless Telephones ) 1995
Three years later, the General Assembly extended the Statewide fee and the additional charges imposed by county governments to wireless telephones and other 911-accessible services. Chapter 158, Laws of Maryland 1995. PSAPs were already receiving a significant number of calls from wireless telephones, albeit without the locational information provided through wireline services. In the view of the legislation's advocates, the 1995 amendments "[eliminated] a loophole permitting certain phone systems to avoid 911 charges." Maryland Association of Counties position statement in support of Senate Bill 332 before Senate Finance Committee (February 15, 1995).
Like wireline telephone companies, wireless carriers were authorized to retain a specified percentage of the Statewide fee to offset administrative costs of collecting the required fees. § 18-105(b)(3) and (4). However, the General Assembly did not expand the permissible uses of the Fund. In particular, it did not entitle wireless carriers to recover their costs in connection with 911 services. Rather, in adding the parity provision of § 18-106(b), the General Assembly simply made clear that wireless carriers were not mandated to assume certain costs, consistent with protection provided to wireline telephone companies.
6. Summary
Although the General Assembly has made numerous changes to the law governing 911 systems since the 911 Law was first enacted, the underlying policy pertaining to use of the Fund has remained constant) that is, to help counties provide 911 services.
C. Effect of Parity Provision of 911 Law
Does the parity provision of the 911 Law entitle a wireless carrier to recover from the Fund the costs of providing enhanced 911 services to its customers? In our view, it does not.
A wireline telephone company is entitled to payments from the Fund only by virtue of its status as a contractor with a local government. When a wireline telephone company provides equipment and services for a 911 system, it does so pursuant to a contractual relationship with the county, a customer of the wireline telephone company. Although counties may call upon the Fund to pay a portion of those costs, the telephone company is not entitled to direct payments from the Fund in its own right. To the extent payments might be made directly from the Fund to a wireline telephone company, the payments are on behalf of the county, rather than as a direct subsidy from the Fund.
By contrast, a county need not enter into a direct relationship with a wireless carrier to provide enhanced 911 services. A wireless carrier is obligated to provide 911 services by federal law. 47 C.F.R. § 20.18. As noted above, the FCC eliminated the original requirement that a cost recovery mechanism be in place as a prerequisite to a wireless carrier's obligation. The FCC's reasoning was that, because wireless carriers rates are not regulated, a wireless carrier could recover its costs in the market place.
Moreover, under the current FCC staff interpretation, a county PSAP's obligation runs only to the selective router maintained by the wireline company.[19] Finally, wireless carriers must employ technology not required for the delivery of enhanced 911 services solely through the wireline network.
Thus, in our view, the parity provision of § 18-106(b) does not entitle wireless companies to recover the costs of the technology necessary to transmit required information through the selective router to the appropriate PSAP.
It is conceivable that a county plan for an enhanced 911 system would involve the county entering into an agreement with a wireless carrier for certain services. If the ENSB approved the plan, and if the costs incurred by the county under the agreement were otherwise eligible, the 911 Law would allow the ENSB to approve the reimbursement of those costs from the Fund, or the direct payment of the wireless carrier as a contractor of the county.
 V Conclusion
A wireless carrier is not entitled to recover from the Fund the costs of providing enhanced 911 services to its customers. However, the ENSB has discretion to approve payments from the Fund for these costs, if the company incurs the costs pursuant to a contract with a local government, if the request is consistent with local plans for enhanced 911 services, and if the expenses otherwise qualify for reimbursement under the State 911 Law.
 J. Joseph Curran, Jr. Attorney General
 William R. Varga Assistant Attorney General
Robert N. McDonald
[1] Our conclusion is consistent with a letter of advice by Assistant Attorney General Stuart M. Nathan, dated January 30, 2002.
[2] Other features include Text Telephone Devices that ensure 911 accessibility to individuals with speech or hearing impairments.
[3] Unless otherwise indicated, all statutory citations in this opinion are to Article 41 of the Annotated Code of Maryland (1997 Repl. Vol., 2001 Supp.).
[4] "County" is defined in the statute to include Baltimore City. § 18-101(f)(1). Throughout this opinion we also use the term "county" to include Baltimore City for brevity.
Section 18-102(b) authorizes counties to operate as part of a multi-county system; however, no county has elected this approach.
[5] The ENSB consists of 13 members appointed by the Governor with the advice and consent of the Senate. The members include representatives of a telephone utility company, the wireless telephone industry, the Maryland Institute for Emergency Medical Services, the Maryland State Police, the Maryland Public Service Commission, the Association of Public Safety Communications Officers, local fire departments, police agencies, and emergency management services, and three public members. § 18-103(b).
[6] When submitting these fees to the State Comptroller, a telephone company is entitled to retain .75 per cent of the State-wide fee for the administrative costs of collecting the charges. § 18-105(b)(2)-(3), as amended by Chapter 440, § 14, Laws of Maryland 2002.
[7] When initially enacted, the law made clear that funding was available for the installation of all equipment described in the definition of "911 system." See § 204H-7(a)(1) (1979 Supp.). Today, the Statewide fee is available solely for system enhancements approved by the ENSB. § 18-107(b).
[8] Section § 18-101(f)(14) defines the term "wireless telephone service" as follows:
 (i) "Wireless telephone service" means public telephone services provided for two way voice or data communication which is transmitted independent of switched local exchange access telephone service and which may in part be transmitted via cable or wire as part of a larger telephone or cable system.
(ii) "Wireless telephone service" includes:
1. Cellular telephone service (cellular);
2. Personal communication service (PCS); and
3. Specialized mobile radio (SMR).
 (iii) "Wireless telephone service" does not include any service that cannot connect a person dialing the digits 911 to an established public safety answering point under the 911 system.
Section 18-101(f)(15) defines "911-accessible service" as "any telephone or other communications service that connects a person dialing the digits 911 to an established public safety answering point under the 911 system."
[9] In your letter, you state that industry representatives are relying on a letter by Assistant Attorney General Kathryn M. Rowe to Senator John C. Astle, dated February 21, 2001, concerning proposed legislation then pending before the Legislature. The focus of Ms. Rowe's letter was the obligations of the counties under Senate Bill 505 (2001), as introduced — not the effect on the industry. In any event, the substantive provisions of both Senate Bill 505 (2001) and the companion bill, House Bill 1078, were eliminated, and the bills instead established a task force on enhanced 911 service. Although House Bill 1078 was enacted as Chapter 521, Laws of Maryland 2001, its provisions were never implemented.
In a position statement submitted in connection with legislation introduced during the 2002 Legislative Session, representatives of the wireless industry contended that "existing Maryland law requires payment of . . . wireless carrier . . . costs for wireless E911 service," citing the 911 Law. See position statement in support of Senate Bill 768, ATT Wireless, Cingular Wireless, Sprint, Verizon Wireless, Voicestream Wireless, before the Senate Finance Committee (February 14, 2002). Copy in Senate Finance Committee bill file on Senate Bill 768 (2002 Session). The proposed 2002 legislation was not enacted.
[10] The Order applied to all cellular licensees, broadband Personal Communications Service, and certain Specialized Mobile Radio licensees. In this opinion, we use the term "wireless carriers" to encompass all of these, for simplicity. A synopsis of the First Report and Order and the regulations are found at 61 Fed. Reg. 40348 (August 2, 1996). The full text of the FCC Report and Order can be found at http://hraunfoss.fcc.gov/edocs_public/attachmatch/FCC-96-264A1.pdf.
[11] Among the more significant changes was recognition of the use of ALI technology included within handsets as an alternative to network-based technology, such as triangulation of a phone's signal. Third Report and Order, summarized in 64 Fed. Reg. 60126 (November 4, 1999). As new options and issues came to light, accuracy levels and implementation time frames were modified. For current phase-in requirements, see 47 C.F.R. § 20.18 (2001).
Currently, the six largest wireless carriers are operating under various extensions granted by the FCC and smaller carriers' requests for waivers are under review.
[12] The full text of the FCC Order is available at http://www.fcc.gov/Bureaus/Wireless/Orders/ 1999/fcc99352.pdf.
[13] The FCC maintained the mandate that a cost recovery system be in place to cover the PSAP's costs of enhanced 911 services. See47 C.F.R. § 20.18(j). But the FCC declined to mandate that states or local governments fund a wireless carrier's costs of compliance.
During 1999, Congress also enacted the Wireless Communications and Public Safety Act of 1999, Pub.L. No. 106-81, 113 Stat. 1286, to "encourage and facilitate the prompt deployment throughout the United States of America of a seamless, ubiquitous, and reliable end-to-end infrastructure for communications, including wireless communications, to meet the Nation's public safety and other communications needs." Id., § 2(b), 113 Stat. at 1287. Among other things, that law required the FCC to designate 911 as the "universal emergency telephone number" for both wireline and wireless telephone services, 47 U.S.C. § 251(e)(3), and to "encourage and support efforts by States to deploy comprehensive end-to-end emergency communications infrastructure and programs, based on coordinated statewide plans, including . . .enhanced wireless 911 service." 47 U.S.C. § 615. However, Congress did not mandate that states implement enhanced 911 services or require that the states address the costs of implementing these services.
[14] A copy of the Bureau's opinion can be found at http://hraunfoss.fcc.gov/edocs_public/attachmatch/DOC-212689A1.ptf.
Prior to issuing its ruling, the Bureau sought public comment on the issues raised by the King County inquiry. Not surprisingly, a majority of the wireless carriers that responded contended that the PSAP is responsible for any system upgrades necessary for a wireless carrier to deliver Phase I information in a form compatible with the existing 911 network; therefore, the appropriate demarcation point would be the wireless carrier's mobile switching center. Public safety organizations, on the other hand, asserted that the wireless carriers are required to provide Phase I data in a form usable by the PSAP; therefore, the appropriate demarcation point is the dedicated 911 selective router maintained by the incumbent local exchange carrier.
[15] The letter stated: "wireless carriers are responsible for all hardware and software components and functionalities that precede the 911 Selective Router, including the trunk [line] from the carriers Mobile Switching Center (MSC) to the 911 Selective Router, and the particular databases, interface devices, and trunk lines that may be needed to implement the . . . methodologies for delivering E911 Phase I data to the PSAP. PSAPs . . . must bear the costs of maintaining and/or upgrading the E911 components and functionalities beyond the input to the 911 Selective Router, including the 911 Selective Router itself, the trunks between the . . . Router and the PSAP, the Automatic Location Identification (ALI) database, and the PSAP customer premises equipment (CPE)." Id., pp. 1-2. The Bureau went on to discuss the application of its decision in terms of three techniques that have been developed in connection with the delivery of Phase I data. Id., pp. 4 — 6.
The letter addressed only Phase I implementation; it is not clear whether the Bureau would necessarily draw the same cost allocation line in connection with Phase II implementation.
[16] Four wireless carriers have filed a petition requesting that the FCC reconsider this conclusion.
[17] The statute read:
 There is established the 911 Trust Fund created for the purpose of providing grants to the counties to finance the installation of a "911 system" on a statewide basis and providing grants to the counties to finance "enhancements" to a "911 system."
Article 41, § 204H-5(a) (1979 Supp.). At the time, nine counties had already implemented 911 systems. Department of Fiscal Services, A Review of 911 (The Emergency Telephone Number) from a National and State Perspective, at p. 6 (January 1983).
[18] Article 41 was recodified in accordance with its current numbering system pursuant to Chapter 5, § 4, Laws of Maryland 1986.
[19] This opinion is based on the technology currently in place and the role of the wireline telephone company in channeling all 911 calls. Future technology may allow wireless systems to operate directly with a PSAP, bypassing the selective router maintained by the wireline company. Should a county then deal directly with the wireless company, the analysis might differ.
 *Page 99